UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

LIANI REYNA,                                              Case No. 3:21-cv-01839-AR

             Plaintiff,                         **OPINION AND ORDER**

    v.

CITY OF PORTLAND, *a municipal corporation*,

             Defendant.

_____

**ARMISTEAD, United States Magistrate Judge**

       Liani Reyna, a retired employee of the Portland Police Bureau (PPB), brings this action against the City of Portland. Following Judge Immergut's ruling on the City's motion to dismiss Reyna's claims, Reyna has four claims remaining. She alleges that the City retaliated against her on the basis of whistleblower status in violation of ORS § 659A.199 (Claim 1) and ORS § 659A.203 (Claim 2); that the City discriminated against her on the basis of sexual orientation in violation of ORS § 659A.030 (Claim 4); and that the City committed *quid pro quo* sexual

Page 1 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

harassment and created a *quid pro quo* hostile work environment in violation of ORS § 659A.030 (Claim 5).[1] (Second Am. Compl. (Compl.), ECF No. 28.) Now before the court is the City's combined motion for judgment on the pleadings and for summary judgment. (Def.'s Mot., ECF No. 92.)

The City moves for judgment on the pleadings as to Claims 1 and 2, contending that Reyna's Complaint does not allege facts supporting a *prima facie* case of whistleblower retaliation under either ORS § 659A.199 or ORS § 659A.203(1)(b). The court concludes that Reyna's factual allegations are sufficient; the City's motion for judgment on the pleadings is denied.

The City also moves for summary judgment as to all claims, contending that Reyna cannot establish that any adverse actions were taken in retaliation for her whistleblowing activities (Claims 1 and 2) or because of her sexual orientation (Claim 4), and that Reyna has no evidence to support her claim for *quid pro quo* sexual harassment and hostile work environment (Claim 5).

The court grants in part and denies in part the City's motion for summary judgment.[2] First off, as to Claim 5, Reyna concedes that it should be dismissed. (Pl.'s Resp. at 28, ECF No.

---

[1]    Judge Immergut dismissed Reyna's claim under ORS § 659A.230 for employment discrimination for initiating or aiding in criminal or civil proceedings (Claim 3), as well as the federal law portion of Claim 4. Further, Reyna resides in Florida, and with the amount in controversy alleged by her, the court has diversity subject matter jurisdiction on her remaining state law claims. 28 U.S.C. § 1332.

[2]    The parties have consented to jurisdiction by magistrate judge as permitted by 28 U.S.C. § 636(c)(1). (Full Consent, ECF No. 55.) The parties request oral argument. The court, however, does not believe that oral argument would help resolve the pending motion. *See* LR 7-1(d)(1).

103.) Regarding Claim 4, the court concludes that the City is entitled to summary judgment, because the record does not support Reyna's theory that she was not promoted because of her sexual orientation. The court also concludes that Reyna cannot prevail, as to most of her alleged adverse employment actions, on Claims 1 and 2. That is because some of the conduct alleged does not rise to the level of an adverse employment action and Reyna cannot show that other actions were taken because of her protected activities. But Claims 1 and 2 survive in part, on the theory that Reyna was compelled to participate in an interview, in which she was asked about her own potential violations of a PPB rule, because of her March 2019 tort claim notice.

## MOTION FOR JUDGMENT ON THE PLEADINGS – CLAIMS 1 AND 2

For purposes of the City's first motion, the facts alleged in the Complaint are accepted as true. Judge Immergut has already set out the relevant background, based on the operative pleadings, in her opinion resolving the City's second motion to dismiss. (ECF No. 41 at 4-9.) The court will not restate those facts here.

### A.    *Legal Standard*

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed – but early enough not to delay trial." "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (quotation marks omitted). As with dismissal under Rule 12(b)(6), judgment on the pleadings is proper when a claim is unsupported by a cognizable legal theory or when the complaint is without sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New*

*Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (describing standard for Rule 12(b)(6) motion).

Assessing the sufficiency of a complaint's factual allegations requires the court to (1) accept that well-pleaded material facts alleged in the complaint are true; (2) construe factual allegations in the light most favorable to plaintiff; and (3) draw all reasonable inferences from the factual allegations in favor of plaintiff. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A plaintiff's legal conclusions that are couched as factual allegations, however, need not be credited as true by the court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

**B.    *Actionable Time Period***

Before analyzing the sufficiency of Reyna's allegations, the court addresses two preliminary matters regarding the "actionable time period" for Reyna's whistleblower claims.

The first matter is whether the statute of limitations for Reyna's whistleblower claims runs from the time of her protected activities, or from the time of the alleged adverse employment actions. The parties agree that the relevant statutes of limitations allowed Reyna one year after the "unlawful employment practice" to bring her claim, by filing a complaint either with Oregon Bureau of Labor and Industries (BOLI) or in court. ORS §§ 659A.820(2), 659A.875(1). Reyna filed a BOLI complaint on July 18, 2019. (ECF No. 41 at 7.)

The City interprets the relevant statute of limitations to mean that Reyna's claims are untimely if the alleged *whistleblowing activities* occurred more than one year before she filed her BOLI complaint. (Def.'s Mot. at 22; Def.'s Reply at 15-18, ECF No. 106.) The City acknowledges that most courts apply the statute of limitations "as of the date of the adverse employment action, not the date of the protected activity." (Def.'s Reply at 16.) But it asks the court to adopt the contrary approach taken in *Losada v. Clatsop County*, Case No. 3:20-cv-00068-BR, 2020 WL 2200431, at *6-7 (D. Or. May 6, 2020), where the court held that a retaliation claim was untimely because it was based on the plaintiff's protected activity that occurred more than a year before she filed her complaint. (Def.'s Reply at 16-17.)

The applicable statute of limitations for Claims 1 and 2 runs from the time of the "unlawful practice." ORS § 659A.820(2) (requiring a plaintiff to file a BOLI complaint "no later than one year after the occurrence of the unlawful practice"). And there is no "unlawful practice" under the relevant statutes until the employer has taken the allegedly retaliatory action against the plaintiff. ORS § 659A.199(1) ("It is an unlawful employment practice for an employer to . . . in any manner discriminate or retaliate against an employee[.]"); ORS § 659A.203(1)(b) ("[I]t is an unlawful employment practice" to "take or threaten to take disciplinary action against an employee[.]"). The court therefore agrees with Reyna that the timeliness of her claims depends on when the alleged adverse employment actions occurred, not when she engaged in protected activities.

The City also seeks summary judgment as to Reyna's allegations of City conduct that occurred after she retired from PPB in June 2019, because only conduct that occurred during her employment is actionable. (Def.'s Mot. at 26-27.) Reyna concedes that the City's actions after

her retirement do not constitute adverse employment actions for purposes of establishing

liability. (Pl.'s Resp. at 9.) But, she contends, the City's conduct after her retirement is relevant

evidence of discriminatory or retaliatory animus. (*Id.* at 10.) The court agrees that conduct after

Reyna's retirement may be relevant to establishing her claims. *See Lyons v. England*, 307 F.3d

1091, 1110-11 (9th Cir. 2002) (describing appropriate background evidence for discrimination

claims); FED. R. EVID. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more

or less probable than it would be without the evidence."). Given Reyna's clarification that she is

not making claims of adverse employment actions after her retirement, the court need not

making a ruling on this part of the City's motion for summary judgment.

## C.    *Analysis*

To state a claim for whistleblower retaliation under either ORS § 659A.199 (Claim 1) or

ORS § 659A.203 (Claim 2), Reyna must allege that (1) she engaged in a protected activity, (2)

she suffered an adverse employment action, and (3) there was a causal link between the two.

ORS § 659A.199; ORS § 659A.203; *see also Lindsey v. Clatskanie People's Util. Dist.*, 140 F.

Supp. 3d 1077, 1091 (D. Or. 2015). In the City's view, Reyna's allegations do not support any of

those elements.

### 1.    Protected Activities

The two statutes cover distinct but overlapping categories of protected activities. An

employee engages in a protected activity under ORS § 659A.199 if she "report[s] information

that [she] subjectively believes is a violation of a state or federal law, rule, or regulation and has

a good faith basis for that belief."[3] *Boyd v. Legacy Health*, 318 Or. App. 87, 98-99 (2022). An employee engages in a protected activity under ORS § 659A.203(1)(b) if she reports information that she reasonably believes is evidence that her public employer has either violated a federal, state, or local law, rule, or regulation, or has committed "[m]ismanagement, gross waste of funds[,] or abuse of authority."[4]

In the City's view, Reyna has alleged no qualifying protected activities under either statute. (Def.'s Mot. at 21, 26.) Reyna points to five communications that she says qualify.

1) Her 2002 lawsuit, in which she alleged discrimination and retaliation in violation of state and federal law, and which was "rebroadcast[ed]" to the "whole police force" in 2018 when she received an award for whistleblowing and the Oregonian published an article referencing her 2002

---

[3]    ORS § 659A.199(1) provides:

It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation.

[4]    ORS § 659A.203(1)(B) provides in relevant part that it is an unlawful employment practice for a public employer to:

(b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

(A) A violation of any federal, state or local law, rule or regulation by the public or nonprofit employer;

(B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the public or nonprofit employer[.]

lawsuit. (*See* Pl.'s Resp. at 12; Compl. ¶¶ 11-15); *Reyna v. City of Portland*, Case No. CV-02-980-ST, 2002 WL 32770553, at *1 (D. Or. Dec. 11, 2002).

2)    Her tort claim notice sent to the City in March. (Pl.'s Resp. at 13; Compl. ¶ 10.) In her March tort claim notice, she alleged "[d]iscrimination and [r]etaliation on the basis of sex, sexual orientation, race, national origin, whistleblowing, and disability based on [t]he Civil Rights Act of 1964 (Title VII), Oregon Law (ORS § 659A.030) and Constitutional Rights (42 U.S.C. §§ 1981, 1983)." (Compl. ¶ 10.) The March tort claim notice described various actions by PPB employees that Reyna alleged were unlawful, including PPB's failure to promote her in fall 2018, failure to investigate Reyna's complaints that she was being harassed by Fox, and its imposition of discipline against Reyna. (Pl.'s Ex. 6 at 4-5.)[5]

3)    A second tort claim notice she sent to the City in May 2019 in which she alleged that PPB retaliated against her for sending her first tort claim notice by compelling her to attend and testify in an IPR hearing. (*Id.* at 7-8.)

4)    Turner's statement (on Reyna's behalf) during the compelled IPR interview that Fox was using PPB resources to harass Reyna. (Pl.'s Resp. at 14; Compl. ¶ 35.)

5)    Her June 19, 2019, request to IPR to reopen a complaint that she had filed in June 2018, because the conduct she had complained of—bullying and harassment—continued. (Pl.'s Resp. at 15; Compl. ¶ 43.)

The court agrees with Reyna that her 2002 lawsuit and her two tort claim notices qualify as protected activities under both ORS § 659A.199 and ORS § 659A.203. In each, she alleged discrimination or retaliation and described the allegedly unlawful conduct by the City. The City disputes that Reyna's allegations, which it views as "conclusory and very vague" (Def.'s Mot. at 23, 26), can support an inference of good faith (ORS § 659A.199) or objective reasonableness (ORS § 659A.203) regarding Reyna's reports. But accepting as true the factual allegations in

---

[5]    As Judge Immergut already held in ruling on the City's Second Motion to Dismiss, the tort claim notices are incorporated by reference into Reyna's Complaint, and thus can be treated as part of the Complaint itself. (ECF No. 41 at 5 n.2.)

Reyna's Complaint (many of which overlap with the allegations in her tort claim notices), and incorporating her tort claim notices into her Complaint (including her first tort claim notice's allegation of discrimination by the Special Emergency Reaction Team (SERT)), the court can easily infer that at least some of the claims in Reyna's 2002 lawsuit and March and May 2019 tort claim notices were made in good faith and were objectively reasonable.

As to Turner's statement and Reyna's June 2019 IPR complaint, the court need not analyze whether they are qualifying protected activities, because Reyna alleges no retaliatory conduct by PPB after those reports and before her June 26, 2019 retirement. (*See* Compl.; Pl.'s Resp.) Accordingly, those protected activities cannot be used to satisfy the first element of her whistleblower retaliation claims.

### 2.    Scope of Covered Adverse Employment Actions

The parties next dispute whether the two whistleblower retaliation statutes prohibit the same adverse employment actions. As to ORS § 659A.199, they agree that it extends to any conduct that is "reasonably likely to deter [an employee] from engaging in protected activity," in conformity with the standard set forth in *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000), and "inherently adopted" in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)[6] for retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (*See* Def.'s Mot. at 19; Pl.'s Resp. at 15-16); *Hunt v. City of Portland*, 726 F. Supp. 2d 1244, 1257 (D. Or. 2010). But, in the City's view, the scope of qualifying adverse employment

---

[6]    As the Supreme Court put it in *Burlington*, an adverse employment action in the retaliation context is conduct that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

actions under ORS § 659A.203 is narrower, because the legislature used different words to describe the prohibited conduct: ORS 659A.199 makes it unlawful for an employer to "in any manner discriminate or retaliate," while ORS § 659A.203(1)(b) makes it unlawful for an employer to "take or threaten to take disciplinary action."

ORS 659.200(1) provides examples of "disciplinary action," explaining that the term:

> includes but is not limited to any discrimination, dismissal, demotion, transfer, reassignment, supervisory reprimand, warning of possible dismissal or withholding of work, whether or not the action affects or will affect employee compensation.

The City asks the court to narrowly interpret the term "discrimination" as used in ORS § 659A.200(1), based on the ordinary meaning of the term being defined, "disciplinary action." It urges the court to use the dictionary definitions of "disciplinary" and "action" to reach the plain meaning of "disciplinary action," which it says is "a deed done for the sake of punishing or imposing order." With that meaning in hand, the City turns to some of the "disciplinary actions" listed in ORS § 659A.200(1)—"dismissals, demotions, supervisory reprimands, and warnings of possible dismissal"—to say that those actions are commonly understood to be disciplinary actions as it defines that term. Hence, the City argues, "any discrimination" should be understood in the same way, and when it is, "any discrimination" means "the treating of someone differently in terms of disciplinary actions taken against an employee, rather than a broader meaning of conduct 'reasonably likely to deter' an employee from taking protected activity." (Def.'s Reply at 22.)

The court is not persuaded by the City's argument. To begin with, the City conspicuously leaves out ORS § 659A.200(1)'s inclusion of "reassignment" and "transfer" as examples of

Page 10 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

disciplinary actions. Those actions can be, as ORS § 659A.200(1) states, disciplinary. But they can also be nondisciplinary—a transfer or reassignment can result in a more desirable work situation or come about at the behest of an employee. Yet when used as an example of a disciplinary action—as something negative—the City's posited meaning ("any discrimination" is "treating of someone differently in terms of *disciplinary action*") begins to come undone because a transfer or reassignment is not inherently or commonly understood to be a disciplinary action. And it exposes the problem of the City's proposed exercise in circularity when it asks the court to use the dictionary definition of "disciplinary action" to define a term explicitly included *within* the scope of "disciplinary action" by the legislature. The legislature expressly included "any discrimination" within the definition of "disciplinary action" in ORS § 659A.200(1), and it is "any discrimination" that gives "disciplinary action" meaning. The City seeks to do the opposite.

The City also relies on *State v. Kurtz*, 350 Or. 65, 74 (2011), to support its proposed interpretive methodology. But that reliance is misplaced. In *Kurtz*, the Oregon Supreme Court considered whether a "tribal police officer" was a "police officer" for purposes of ORS § 811.540. That term was "defined in ORS 801.395," which provided:

> "Police officer" includes a member of the Oregon State Police, a sheriff, a deputy sheriff, a city police officer, a Port of Portland peace officer or a law enforcement officer employed by a service district established under ORS 451.410 to 451.610 for the purpose of law enforcement services.

*Kurtz*, 350 Or. at 70-71 (quoting ORS § 801.395). Noting that "tribal police officer" was not included in § 801.395's "nonexclusive list," and that "the term 'includes' in that statute indicate[d] that the phrase 'police officer' [could] embrace persons *beyond* those that the statute expressly list[ed]," the court looked to the ordinary definition of the term "police officer" to

determine whether a "tribal police officer" also fell within the term's meaning. *Id.* at 71-72 (emphasis added). In that context, it made sense to look to the ordinary meaning of "police officer" to discern whether the legislature intended that term to encompass "tribal police officers," in addition to the types of officers explicitly included in the statutory definition. But here, the court is tasked with defining an action listed in the definition statute, rather than identifying what the definition statute encompasses beyond what it expressly lists.

Reading the statutory definition in its entirety does not supports the City's narrow understanding of the conduct covered by ORS § 659A.203. In addition to the terms "reassignment" and "transfer," the definition also provides that the examples are "not limited to" the listed examples, which also indicate a broader understanding of the retaliatory actions a public employer can take to retaliate against whistleblowing. The City has not provided the court with a reason to depart from the from the Ninth Circuit's definition of an adverse employment action in *Ray*. Accordingly, the court concludes that ORS § 659A.203(1)(b), like ORS § 659A.199, extends at least to conduct "reasonably likely to deter [an employee] from engaging in protected activity." *See also Hunt*, 726 F. Supp. 2d at 1257 (so holding).

### 3.    Alleged Adverse Employment Actions

Reyna identifies six adverse employment actions: failure to promote her in 2018, harassment by two other sergeants who demanded to know when she was going to retire and implied that she should retire, publication within PPB of her name as an IPR complainant, disciplinary suspension in September 2018, the compelled interview in May 2019, and constructive discharge in June 2019. (Pl.'s Resp. at 3, 15-17; Compl. ¶¶ 19-25, 30-35, 37, 110, 114.)

The City disputes that several of those actions qualify as adverse employment actions. But whether those actions are "reasonably likely to deter [Reyna] or others from engaging in protected activity," *Ray*, 217 F.3d at 1242-43, is a "fact-intensive question" inappropriate for a motion for judgment on the pleadings. *Pringle v. Wheeler*, 478 F. Supp. 3d 899, 919 (N.D. Cal. 2020) (declining to decide on motion to dismiss whether pre-disciplinary hearing was an adverse employment action); *accord Prouty v. Berryhill*, Case No. CV 18-08567 PA (JPRx), 2019 WL 8164378, at *3 (C.D. Cal. Oct. 28, 2019) (same, as to allegations of abusive comments and exclusion from meetings). The court therefore declines to resolve, based on the pleadings, whether the alleged conduct meets the standard for adverse employment actions, and will instead address that issue in resolving the City's motion for summary judgment.

The City also says that Reyna has failed to allege facts supporting an inference of a causal link between Reyna's protected activities and the City's adverse employment actions, as necessary to show that Reyna can satisfy the third element for a retaliation claim. The court disagrees.

Regarding the failure to promote, Reyna alleges that she was denied a promotion in fall 2018 in part because of her history as a whistleblower and her 2002 lawsuit, which was republicized in early 2018. (*See* Compl. ¶¶ 14-17, 22-24.) According to her Complaint, PPB decided not to promote her after she participated in a panel interview for the position, and one of the panel members was a former SERT member against whom the 2002 lawsuit had alleged discrimination. (*Id*. ¶¶ 22-23.) She also alleges that she was the only candidate for lieutenant who was not promoted. (*Id*. ¶¶ 18-19, 25.) Those allegations, taken together, allow the court

reasonably to infer that she was not promoted in 2018 because of her earlier litigation against PPB.

As to harassment by other PPB sergeants, Reyna alleges that, about three weeks after she filed her first tort claim notice in March 2018, two white male officers who knew of her tort claim notice approached her, demanded to know when she was retiring from PPB, and implied that she should retire from PPB. (Pl.'s Resp. at 16; Compl. ¶ 30.) Timing alone supports an inference that the officers acted as they did because of her tort claim notice. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (inference of causation supported where adverse employment actions occurred 42 and 59 days after protected activities).

Reyna also alleges that, about a month after she sent her first tort claim notice, PPB initiated a new IPR case on the allegations in her tort claim notice, sent out an official memorandum and notice of interview regarding the case that identified Reyna as the complainant, and required her to attend the interview and to answer questions under oath about the basis for her tort claim notice. (Compl. ¶¶ 31-34.) Reyna's allegations, about an IPR case and interview that were specifically aimed at addressing the allegations in her tort claim notice, support a reasonable inference that those actions were taken *because of* her tort claim notice.

Finally, Reyna contends that she has alleged as adverse employment actions that she was disciplined for bullying in September 2018 and that she was constructively discharged in June 2019. (Pl.'s Resp. at 2-3, 10.) The court assumes, without deciding, that she has properly alleged

Page 14 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

retaliation claims as to those actions because, as explained later in this opinion, her claims regarding those actions fail on summary judgment.

Reyna's allegations suffice to state a claim for whistleblower retaliation under ORS § 659A.199 and ORS § 659A.203(1)(b), on the theories that she was not promoted in 2018 because of her 2002 lawsuit, and was pressured to retire, publicly identified as a complainant, and compelled to participate in an IPR interview[7] as a result of her first tort claim notice.

## MOTION FOR SUMMARY JUDGMENT – ALL CLAIMS

### A.    *Legal Standards*

*Summary Judgment*. A party is entitled to summary judgment under Rule 56 "only if, taking the evidence and all reasonable inferences in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law." *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020) (quoting *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019)); FED. R. CIV. P. 56(a). A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment involves burden shifting. The City, as the moving party without the ultimate burden of persuasion at trial, has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the City "must

---

[7]    The court considers the compelled interview and the alleged questions and statements during that interview together as a single employment action.

either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* To carry its burden of persuasion, the City "must persuade the court that there is no genuine issue of material fact." *Id*. If the City carries its burden of production, Reyna, as the nonmoving party, must produce evidence to support her claims, *id*. at 1103, and must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *F.T.C. v. Stefanchik,* 559 F.3d 924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."). If Reyna fails to make that showing, then the City is entitled to summary judgment. *Nissan Fire*, 210 F.3d at 1103.

*Summary Judgment in Employment Discrimination Cases.* To survive a motion for summary judgment on a disparate treatment under ORS § 659A.030, or a whistleblower retaliation claim under ORS §§ 659A.199 or 659A.203, "a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021) (quotation marks omitted) (disparate treatment under Title VII); *Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011) (same legal framework applies to claims under ORS § 659A.030); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1049 (D. Or. 2012) (same legal framework applies to retaliation claims under ORS §§ 659A.199 and 659A.203).

"Under either approach, staving off a motion for summary judgment . . . entails three steps." *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023). First, the plaintiff must establish her *prima facie* case of discrimination or retaliation. If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory conduct. "The plaintiff may then offer evidence that the proffered nondiscriminatory reason is merely a pretext for discrimination." *Surrell*, 518 F.3d at 1105-06; *Opara*, 57 F.4th at 721-24.

> 1. ***Prima Facie*** **Case**

In the disparate treatment context, a plaintiff can raise an inference of discriminatory intent by showing (1) she belongs to a protected class; (2) she was qualified for the position and performing her job satisfactorily; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Opara*, 57 F.4th at 722; *Hawn v. Exec. Jet. Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010). Alternatively, a plaintiff can simply produce "direct or circumstantial evidence of discriminatory motive to establish her *prima facie* case." *Opara*, 57 F.4th at 722 (italics added); *Surrell*, 518 F.3d at 1105.

In the retaliation context, a plaintiff makes her *prima facie* case by showing that (1) she engaged in a protected activity; (2) she was subject to an adverse employment action; and (3) there was a causal connection between the two. *Surrell*, 518 F.3d at 1108.

Common to both discrimination and retaliation claims is the requirement that the plaintiff allege that she was subject to an adverse employment action. "The Ninth Circuit defines adverse employment actions broadly." *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 960 (D. Or.

2011). In the disparate treatment context, "an adverse employment action is one that materially

affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec.*

*Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (simplified). That is, the employer's conduct must have

an "adverse effect on the employee's work or status" to constitute an adverse employment action.

*Schlosser v. Potter*, 248 F. App'x 812, 817 (9th Cir. 2007). In the retaliation context, the

definition of adverse employment action is broader: it includes any action that is "reasonably

likely to deter [an employee] from engaging in protected activity." *Coszalter v. City of Salem*,

320 F.3d 968, 976 (9th Cir. 2002).

> A variety of conduct has met these definitions, including: a lateral transfer, or refusing a lateral transfer; undeserved negative performance evaluations or job references if motivated by retaliatory animus and not promptly corrected; being excluded from meetings, seminars, and positions that would have made the employee more eligible for salary increases; being denied secretarial support; eliminating job responsibilities; and receiving a more burdensome work schedule. *Shepard*, 829 F. Supp. 2d at 960 (collecting cases). In contrast, mere ostracism or offensive utterance by co-workers does not qualify as an adverse employment action.

*Retherford v. Portland Pub. Schs.*, Case No. 3:18-cv-00401-JR, 2019 WL 7879880, at

*14 (D. Or. Dec. 3, 2019).

"Whether a particular [action] is materially adverse depends upon the circumstances of

the particular case, and should be judged from the perspective of a reasonable person in the

plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 71 (2006) (quotation marks omitted). The plaintiff bears the burden of

showing how a reasonable employee would have found each of the challenged actions materially

adverse. *Id.* at 68.

**2.      Legitimate, Nondiscriminatory Reason**

"Once a *prima facie* case has been made, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. This burden is one of production, not persuasion and involves no credibility assessment." *Opara*, 57 F.4th at 723 (simplified).

**3.      Pretext**

At the third step, a plaintiff can prove that the employer's proffered explanation is pretext either "(1) directly, by showing that unlawful discrimination more likely than not motivated the employers; [or] (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or via a combination of these two kinds of evidence." *Opara*, 57 F.4th at 723 (simplified). Although "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (simplified), when an employer provides "abundant and uncontroverted independent evidence" to suggest discrimination did not occur, a "plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Opara*, 57 F.4th at 724 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). The plaintiff retains the ultimate burden of persuasion that "an employer's contested action was 'due in part or [in] whole to discriminatory intent.'" *Opara*, 57 F.4th at 724 (quoting *McGinest*, 360 F.3d at 1123).

**B.      *Background***

The following facts are undisputed. Reyna served as a police officer for the Portland Police Bureau (PPB) for 26 years, from 1993 until she retired on June 26, 2019. In 1999, Reyna

was selected as the first openly gay Latina member of the previously all-male PPB SERT team. In 2002, based on her experiences on the SERT team, Reyna sued alleging employment discrimination by, among others, the City of Portland and PPB. Following trial, a jury returned a verdict for the defendants. Jury Verdict, *Reyna v. City of Portland*, Case No. 3:02-cv-00980-JO (D. Or. June 14, 2005), ECF No. 386; (Def.'s Mot. at 15-16; *see also* Pl.'s Resp.).

Sara Fox has worked for PPB since approximately 1999, and continues to work there. Reyna and Fox were in a romantic relationship while they both worked at PPB, until they separated in 2012. (Def.'s Mot. at 15-16; *see also* Pl.'s Resp.) They have a daughter together, and so they continued to communicate regularly after their breakup, to coordinate scheduling and discuss their daughter's care.

Between 2016 and 2018, PPB's Internal Affairs Division (IA) opened four investigations stemming from Fox and Reyna's communications with one another and their personal relationship. Two involved alleged misconduct by Reyna, two involved alleged misconduct by Fox.

The first, Case 2016-B-0050, was initiated in December 2016, following a complaint from Officer Greg Moore. (Def.'s Sealed Ex. 3 at 2, ECF No. 94-1 at 4-34.) Moore was dating Fox at that time, and had been since sometime in 2015. (*See* Def.'s Sealed Ex. 4 at 1-7, ECF No. 94-1 at 35-65; Def.'s Sealed Ex. 8 at 4, ECF No. 94-1 at 75-82.) One of the allegations in Case 2016-B-0050 was that Reyna had bullied Fox by "repeatedly threaten[ing] her reputation in person and in text." (Def.'s Sealed Ex. 3 at 1.) Specifically at issue were Reyna's communications to Fox regarding her relationship with Moore, a relationship that Reyna thought was inappropriate. (First Reyna Dep. at 116:6-8, ECF No. 93 at 26-70.) IA investigator Teresa

Uttke investigated the case in February and March 2017. She interviewed nine PPB members, including Reyna, Fox, and Moore. (Def.'s Sealed Ex. 3.) Uttke also reviewed emails and texts between Fox and Reyna, forwarded to her by Fox. (Def.'s Sealed Ex. 4 at 1-14; First Reyna Dep. at 111:13-14.) Uttke completed her investigation report on April 6, 2017. (Def.'s Sealed Ex. 4 at 1.) The allegation of bullying was sustained in July 2017, and in September 2018 Reyna was disciplined with a one-day suspension without pay. (Def.'s Sealed Ex. 1 at 72, 74, 86, ECF No. 94-1.)

The next IA case, 2017-B-0023, was initiated by Reyna's complaint against Fox in April 2017. (Reyna Dep. at 145:3-16; Def.'s Sealed Ex. 11, ECF No. 94-2 at 1-2; Def.'s Sealed Ex. 12 at 1, ECF No. 94-2 at 3-10.) In an email to IA, Captain Michael Crebs described Reyna's allegations that Fox had made false statements to the court in their custody dispute in Washington County, that Moore had seen their daughter naked in Fox's home when she came out of her bedroom naked, and that Fox might be a danger to herself or to Reyna. (Def.'s Sealed Ex. 11 at 1-3.) An IA investigator interviewed Reyna and reviewed texts and emails between Reyna and Fox. (Def.'s Sealed Ex. 12; Def.'s Sealed Ex. 13, ECF No. 94-2 at 11-54.) Based on that information, IA determined that there was no reason to believe that Fox had violated any PPB directives, and administratively closed the case. (Def.'s Sealed Exs. 14, 15, ECF No. 94-2 at 55-57.)

In either July or August 2017, Fox reported that she had received two harassing emails from Reyna. IA opened Case 2017-B-0033 to investigate those allegations. In the first email, Reyna wrote that Moore was an unsafe driver and had nearly hit Reyna's truck as Reyna was driving near Fox's house. In the second email, Reyna again raised the incident of Moore seeing

Page 21 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

their child naked in Fox's home in late 2015 or early 2016, and asked Fox whether she was

taking steps to avoid Moore seeing their child undressed. An IA investigator reviewed the emails

and interviewed Fox. IA then concluded that the alleged conduct did not violate any PPB

directive, and administratively closed the case. (Def.'s Sealed Exs. 17-22, ECF Nos. 94-2 at 59-

72 & 94-3 at 1-2.)

In May 2018, Reyna followed up with IA about the case she had initiated against Fox in

April 2017 (Case 2017-B-0023), because she received no notice of the case's disposition. (Def.'s

Sealed Ex. 23 at 1-2, ECF No. 94-3 at 3-4.) She wrote in her email that "[Fox]'s conduct against

me has not stopped, and now she is threatening to abuse my daughter." (*Id*. at 1.) In light of the

new allegation, IA opened a new case, 2018-B-0033. (*Id.*) An IA investigator interviewed Reyna

on June 5. Two days later, Reyna emailed the investigator that she had "learned what motivated

[Fox] to do what she did," and withdrew her complaint. (*Id.* at 5.)

But, during the interview, Reyna also complained that Fox had, over an 18-month period,

sent Reyna 44 emails late at night or very early in the morning. Reyna alleged that those emails,

sent during her sleeping hours, were harassment. (First Reyna Dep. at 185:7-14; Def.'s Sealed

Ex. 25 at 1, ECF No. 94-3 at 6-8.) That allegation became part of Case 2018-B-0033. (Def.'s

Sealed Ex. 25 at 1-2.)

Investigating the allegation, the IA investigator reviewed emails that Fox had sent to

Reyna in 2016 and 2017. (Def.'s Sealed Ex. 26, ECF No. 94-3 at 9-94.) The investigator's report

noted that 33 of the emails had been sent while Fox, who worked the graveyard shift, was on

duty, but all the emails related to the care and custody of her child, and it was appropriate to use

limited City time for that purpose. (Def.'s Sealed Ex. 25 at 2-3.) IA concluded that the alleged

conduct did not violate any PPB directives, and administratively closed the case. (Def.'s Sealed Ex. 28, ECF No. 94-3 at 96.)

In September 2018, Reyna applied for a promotion to lieutenant. The recruitment process had three phases: (1) an evaluation of each applicant's training and experience, based on the applicant's resume and answers to supplemental questions, (2) a multipart lieutenant's assessment, including a writing assignment and a structured panel interview, and (3) an interview with the Command Interview Panel and a holistic review of the applicant's qualifications, including disciplinary history. (Def.'s Ex. 21 at 2, ECF No. 93 at 276-82.) A candidate would only move on to the next phase if they had passed the previous one. (*Id.*)

Reyna passed the first phase. (Pl.'s Ex. 8 at 1.) She then participated in the lieutenant's assessment (Phase Two). Her final score on the assessment was 71.57, the lowest score of any candidate. (Def.'s Ex. 23 at 3, ECF No. 93 at 284-92; Pl.'s Ex. 10 at 1-2, ECF No. 105 at 58-59.)

After the assessments had been scored, Human Resources employee Rebecca McKechnie sent Assistant Chief Chris Davis an anonymized list of all the scores, asked him where he would like to set the pass point, and informed him that the prior two recruitments had used 75 as the pass point. Davis set the pass point at 75. (Pl.'s Ex. 10 at 1; McKechnie Dep. at 78:18-23, ECF No. 93 at 202-12.) Because Reyna's score was below 75, she did not move on to Phase Three, and she did not receive a promotion. (McKechnie Dep. at 74:19-75:24.)

On March 18, 2019, Reyna sent the City a tort claim notice. She alleged, among other things, that PPB had discriminated against her based on her race, sex, and sexual orientation when it denied her the promotion to lieutenant. She also alleged a pattern of retaliation following her 2002 lawsuit against the City. (Pl.'s Ex. 6, ECF No. 105 at 46-51.)

Page 23 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

Three weeks after Reyna sent her first tort claim notice, Sergeant John Birkinbine angrily asked Reyna when she was retiring. Later, another sergeant, Rob Simon, approached Reyna at a Starbucks coffee shop and asked her, in a hostile demeanor, when she was going to retire. (First Reyna Dep. at 51:10-56:11.)

Sometime between March 18 and May 7, 2019, Reyna received a notice of interview, which identified her as the complainant in Case 2019-B-0022 before the Independent Police Review (IPR).[8] (*Id.* at 47:6-11; Pl.'s Ex. 4 at 6, ECF No. 105 at 17-23.) IPR had opened the case to investigate allegations of misconduct in Reyna's tort claim notice that had not been the subject of previous IPR or IA investigations. The notice's listing of Reyna as the complainant was inaccurate; she had not filed a complaint with IPR. The complainant was actually PPB, and that was correctly noted elsewhere in the case file. (*Id.*)

Reyna was required to participate in an IPR interview for Case 2019-B-0022, as a witness, regarding the allegations in her March 2019 tort claim notice. During the interview, which occurred on May 7, 2019, she was warned that failure to answer the interviewers' questions "completely and truthfully" would "be considered a separate and serious violation" for which Reyna could "be disciplined up to and including discharge." (Pl.'s Ex. 4 at 1-2.) Daryl Turner, the President of the Portland Police Association (Reyna's union), was present at the interview. He objected to Reyna's being compelled to participate in the interview because of her tort claim notice. He stated that he had never seen "a person who has filed a civil tort claim be[]

---

[8]     The Independent Police Review is a City of Portland agency providing impartial oversight of police conduct, practices, and policies. City of Portland, Independent Police Review, https://www.portland.gov/ipr (last visited March 5, 2025).

compelled to make statements" in an IPR interview. (*Id.* at 2.) An IPR investigator explained that it was routine for IPR to open an investigation after receiving a tort claim notice, but could not say one way or the other whether IPR had ever compelled the filer of a tort claim notice to participate in an interview related to her tort claims. (*Id.* at 2-3.)

Reyna sent the City a second tort claim notice on May 28, 2019. She alleged that the compelled interview with IPR was retaliation for sending her first tort claim notice. (Pl.'s Ex. 6 at 7-8.)

On June 19, 2019, Reyna sent a memorandum to IPR. (Def.'s Sealed Ex. 29 at 1, ECF No. 94-3 at 97-101.) She complained that Fox had contacted the Fire and Police Disability and Retirement Fund and attempted to access confidential information related to Reyna's pension. (*Id.* at 2.) She also complained that James Gowin, Stacey Rovinelli, and Rebecca McKechnie had "failed to follow PPB policies" regarding her complaint in case 2018-B-0033. (*Id.*)

Reyna retired from PPB on June 26, 2019.

**C.    *Evidentiary Objections***

Before getting to the merits of the City's motion for summary judgment, the court addresses the City's objections to all except three[9] of Reyna's exhibits. (Def.'s Reply at 7-11.) The City's objections fall into two categories: authenticity and hearsay.

*Authenticity.* The City objects to Reyna's Exhibits 1, 4, 7, 8, 9, 10, 11, and 13 on the basis that those exhibits are not properly authenticated because nothing suggests that Patrick Conroy,

---

[9]    The City states in its Reply that it objects to all except *two* of Reyna's exhibits—exhibits 5 and 12. (Def.'s Reply at 7.) But the City makes no specific objections to exhibit 6. (*Id.* at 7-11.)

who submitted the declaration in support of those exhibits, had any personal knowledge about

those exhibits. Reyna supplemented her exhibits with her own declaration (ECF No. 112)

authenticating Exhibits 4, 7, 8, 9, 10, and 11, and an additional declaration from Conroy (ECF

No. 111) authenticating Exhibit 1. The City's authenticity objections to those exhibits are

therefore overruled.[10]

  As to Exhibit 13 (ECF No. 105 at 66-68), Reyna argues that it is self-authenticating under

Federal Rule of Evidence 902. Reyna does not cite to a particular part of that Rule, and it is not

apparent to the court how Exhibit 13 is self-authenticating. Accordingly, the court will not

consider Exhibit 13 in resolving the City's motion for summary judgment.[11]

  *Hearsay.* The City also objects to Reyna's Exhibits 1, 2, 3, 4, 7, 8, 9, 10, and 11 as

inadmissible hearsay. Although hearsay objections are generally for trial, Federal Rule of Civil

---

[10] Reyna also points out in her Surreply that at least one of the exhibits to which the City objects on the basis of authentication was authenticated *by the City* during the deposition of Jeffrey Bell, and that other exhibits to which the City objects were produced by the City in discovery. But what's most surprising is that the City objects to the authenticity of Reyna's Exhibit 10, which is the *same email chain* as the City's Exhibit 24 (ECF No. 93 at 293-94). The court can see no good-faith basis for the City to contest the authenticity of a document it has already authenticated.

  Moving forward, the court expects that all evidentiary objections be made carefully, and encourages the City to stipulate to the authenticity of documents whose authenticity it does not actually dispute. Otherwise, the City unreasonably taxes the time and resources of the court, and opposing counsel.

[11] In any case, that exhibit—an excerpt from the transcript of a Citizen Review Committee meeting held in 2020, reviewing PPB's 2017 investigation in Case 2016-B-0050 (bullying), including the statements of an unidentified speaker during that meeting that one of the questions asked in the 2017 investigation "made me extremely uncomfortable," because the speaker understood that question to "referenc[e] [Reyna's] protected class" (Pl.'s Ex. 13 at 2)—has no relevance to whether the City discriminated against Reyna or held discriminatory animus.

Procedure 56, which governs motions for summary judgment, permits a party to object that cited

material "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P.

56(c)(2).

Exhibits 2 and 3 are deposition transcripts. (ECF No. 105 at 6-9 (Bell Dep.) & 10-16

(Day Dep.).) The City argues that Reyna cannot rely on "statements from the transcript to prove

the truth of matters asserted in that transcript." [12] (Def.'s Reply at 8-9.) That is incorrect. Reyna

can rely on deposition testimony for the truth of the matters asserted. Deposition testimony can

generally be presented in a form that will be admissible at trial, because the subject of the

deposition can either testify as a witness at trial or, if the witness is unavailable, the deposition

testimony itself can be admitted. *See Orr v. Bank of Am.*, 285 F.3d 764, 780-82 (9th Cir. 2002)

(excluding hearsay *within* deposition testimony, but otherwise considering statements in

deposition testimony for the truth of the matters asserted in resolving motion for summary

judgment); FED. R. EVID. 804(b)(1); *see also* FED. R. CIV. P. 56(c)(1)(A).

As to the City's hearsay objection to Exhibit 11 (ECF No. 105 at 60-62), the court agrees

with Reyna that her citation to a question in the interview transcript—"[W]ould it have made a

difference if [Fox] had dated – been dating a female?" (Pl.'s Ex. 11 at 2)—is not "for the truth of

the matter asserted," because it is not offered as proof of any fact impliedly asserted by the

question. *See United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015) (A question is hearsay

---

[12]     It is worth noting that the City relies on deposition transcripts, for the truth of the matters asserted in those transcripts, throughout its motion for summary judgment. (Def.'s Mot. at 30-34.)

Page 27 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

only "where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message.").

The relevant portions of Exhibits 7, 8, 9, and 10 are emails from City employees. (ECF No. 105 at 54-55 (Ex. 7), 56 (Ex. 8), 59 (Ex. 9).) Those emails are not hearsay because they are statements by the opposing party (the City). FED. R. EVID. 801(d)(2).

Exhibit 4 contains excerpts from the transcript of a May 2019 interview regarding Reyna's first tort claim notice. That transcript is not hearsay to show what was said during the interview. *United States v. Valerio*, 441 F.3d 837, 844 (9th Cir. 2006). As to the portions that Reyna relies on for the truth of the matters asserted, there is no reason why the speakers could not testify to those matters as witnesses at trial.

Finally, as to Exhibit 1 (ECF No. 105 at 4-5), the court denies the City's objection as moot, because consideration of potential hearsay within that exhibit does not alter the court's analysis. *See, e.g.*, *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1109 (D. Or. 2007) (denying defendant's motion to strike because "the court's consideration of material that [was] the subject of defendant's motion was not outcome determinative"); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, Case No. 3:14-cv-00751-GPC-AGS, 2017 WL 3149578, at *6 (S.D. Cal. July 24, 2017) (stating that the court would address "only the salient objections" regarding party's evidence on motion for summary judgment).

Having resolved the City's evidentiary objections, the court proceeds to the merits of the City's motion for summary judgment.

\ \ \ \ \

\ \ \ \ \

Page 28 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

D.    *Claim 4 – Sexual Orientation Discrimination*

Reyna alleges that she was not promoted to lieutenant because of her sexual orientation. (Compl. ¶¶ 122-132.) The City moves for summary judgment on that claim, contending that Reyna will be unable to raise an inference of discriminatory motive. It points to the undisputed facts that (1) that Reyna had the lowest score on the lieutenant assessment, which was the only score below the pass point of 75 (Def.'s Mot. at 33-34; Second Reyna Dep. at 387:12-21, ECF No. 93 at 71-130), and (2) three out of 16 candidates who were promoted to lieutenant during the same recruitment were gay (two female and one male). (Def.'s Mot. at 34; Second Reyna Dep. at 355:15-356:9.) In light of those facts, the City observes, Reyna will be unable to create an inference of discriminatory motive using the *McDonnell-Douglas* framework.

In response, Reyna points out that she need not use the *McDonnell-Douglas* framework to survive summary judgment—she can create an inference of discriminatory motive through other evidence, direct or indirect. *Freyd*, 990 F.3d at 1228. She then makes three arguments to support her theory. *First*, she says that the 75 percent pass point was arbitrary and was selected to exclude her, and only her, from promotion. (Pl.'s Resp. at 25.) *Second*, she says that the investigation into whether Reyna had bullied Fox "was tainted by sexual orientation discrimination," and that the results of that investigation (including Reyna's one-day suspension) were used to deny Reyna's promotion. (Pl.'s Resp. at 26-27 (citing Pl.'s Ex. 11 at 2).) And *third*, she contends that, at some point before he became Chief, Robert Day, who issued the discipline for the bullying charge in September 2018, said that he enjoyed coaching football "because it was the last good old boy club around," and, again, she contends that that discipline was used to deny her promotion. (Pl.'s Resp. at 28; Pl.'s Ex. 3 at 5-6.)

As to Reyna's first point, it is undisputed that the pass point of 75 percent was selected by Davis, who viewed an anonymized list of scores when selecting the pass point. Reyna does not contend that Davis, in selecting the pass point, knew that Reyna had the lowest score, or intended to discriminate against Reyna in setting the pass point. (*See* Pl.'s Resp. at 24-28.) Rather, she argues that McKechnie, who generated the anonymized list and sent it to Davis, knew that Reyna had the lowest score and wanted Reyna to be denied the promotion, and that Davis only selected the 75 percent pass point on McKechnie's recommendation. In the email McKechnie sent to Davis, she wrote: "The Lieutenant scores are below. Please let me know where you want to set the pass point. For the last LT recruitment, the pass point for the last 2 recruitments was 75." (Pl.'s Ex. 10.) Davis replied, "Let's use 75%. Thanks!" (*Id.*) McKechnie also testified in her deposition that the pass point of 75 was consistent with the two prior recruitments (McKechnie Dep. 78:2-23), and Reyna provides no evidence suggesting otherwise. As a result, Reyna has failed to show that pass point of 75 was selected to exclude her from promotion.

Regarding Reyna's arguments that her promotion was denied because of the bullying investigation or resulting discipline, which was in turn motivated by sexual orientation discrimination, that theory is unsupported by the record. Reyna explains her theory as follows:

> [The City] investigated [Reyna] for "bullying" her ex-wife. As evidenced by the questioning of the witnesses, the investigation was tainted by sexual orientation discrimination. The investigation lay dormant for nearly a year. Then, when [Reyna] applied for promotion, the discipline was promptly issued. The individual who issued the discipline said, in effect, that the discipline should have been considered. The human resources professional could not say how it was considered. Needless to say, an investigation tainted by sexual orientation discrimination must have affected [Reyna]'s promotion.

(Pl.'s Resp. at 25-26.)

But the City has produced evidence showing that the denial of Reyna's promotion was not based on her disciplinary history. The lieutenant recruitment required her to participate in a three-phase process. At Phase One, the City would evaluate "each applicant's training and experience, as demonstrated in their resume and responses to supplemental questions." (Def.'s Ex. 21 at 2.) If an applicant met the required qualifications to pass Phase One, she would advance to Phase 2, which involved a multipart assessment consisting of a writing exercise, a structured panel interview, and an oral presentation. (*Id.*) Candidates would receive a score on the assessment, and candidates with a passing score would move on to Phase Three. At Phase Three, candidates would interview with a "Command Interview Panel" (CPI). The CPI would then make recommendations to the Chief based on the interview, as well as each applicant's resume, answers to supplemental questions, recommendations from managers, work history, and the assessment center total score. (*Id.*) Disciplinary history was not considered until Phase Three. (*See also* McKechnie Dep. at 74:19-75:24 (explaining that past discipline was not considered in establishing a score at Phase Two, but could be considered in the "final determination" at Phase Three).)

Reyna does not provide any evidence suggesting that, contrary to the process described in the recruitment announcement, her past discipline was considered in failing her at Phase Two. Instead, she points to the deposition of Day, where he affirmed that PPB considers past discipline in awarding promotions, noting that "it varies from cases to case" how discipline might affect a candidate's promotion. (Pl.'s Resp. at 27; Day Dep. at 20:24-22:18.) Reyna also points to McKechnie's deposition, where McKechnie said that she could not explain how exactly past discipline was considered, because she wasn't involved in that part of the process. (Pl.'s Resp. at

27; McKechnie Dep. at 73:2-10.) But those statements are consistent with the City's contention (and supporting evidence) that past discipline was only considered in Phase Three. And Reyna does not dispute that she failed at Phase Two, never advancing to Phase Three. (Pl.'s Resp. at 24-28; *see also* Pl.'s Ex. 10; First Reyna Dep. at 88:1-92:20; Second Reyna Dep. at 383:8-387:21.) Reyna has thus failed to raise a genuine dispute of material fact that her past discipline was a factor in the City's decision not to promote her. Nor does she contend that Uttke or Day—who she alleges to have made statements that constitute "direct evidence" of discrimination—played any role in scoring her lieutenant's assessment or setting the pass point.

In her Complaint, Reyna also alleges that the City withheld her promotion "because of her sexual orientation *and race*, identifying as a gay Latina, and that both, which are inseparable, played a substantial role in their decision-making process to deny her promotion." (Compl. ¶ 130 (emphasis added).) But Reyna has identified no evidence suggesting that either her score on the lieutenant's examination or the pass rate for that examination were influenced by racial animus. (*See* Pl.'s Resp.)

In sum, the City has met its burden on summary judgment to show that Reyna will not be able to prove an essential element of her claim—that the City failed to promote her because of her sexual orientation (or race). The City is entitled to summary judgment on Claim 4.

## E.    *Claims 1 and 2—Whistleblower Retaliation*

In the City's view, Reyna cannot establish a *prima facie* case of whistleblower retaliation. As to Claim 2, the City contends that Reyna cannot establish that she engaged in any qualifying protected activities. And, as to both claims, the City says that several of the complained-of actions do not constitute "adverse employment actions," and that Reyna cannot show a causal

link between any adverse employment actions and her protected activities. Even if she can make out a *prima facie* case as to the alleged adverse employment actions, the City offers legitimate, nondiscriminatory reasons for some of the actions it took.

 *Protected Activities.* For purposes of summary judgment, the City does not dispute that Reyna has engaged in protected activities as to Claim 1. As to Claim 2, however, the City appears to dispute that Reyna can establish her protected activities, asserting that she will be unable to establish that her reports that the City's conduct was unlawful were "objectively reasonable." (Def.'s Mot. at 32.) But the City provides no analysis of that issue, nor does it point to any evidence relating to what Reyna knew at the time of her reports. (*See id.*) The City has therefore failed to meet its initial burden of production to "either produce evidence negating" that Reyna's reports were based on objectively reasonable beliefs, "or show that the [Reyna] does not have enough evidence [on that issue] to carry [her] ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102.

 *Alleged Adverse Employment Actions.* Having concluded that Reyna can meet the first element of her *prima facie* case as to both Claims 1 and 2, the court examines whether Reyna can survive summary judgment as to each adverse employment action. The City, for its part, does not dispute that Reyna's alleged adverse employment actions occurred. Rather, it argues that certain of those actions (statements by other officers, identifying her as complainant, and the May 2019 interview) do not qualify as adverse employment actions, that Reyna cannot show causation as to others (failure to promote, constructive discharge, discipline for bullying), and that it had a nonretaliatory reason for conducting the May 2019 interview. (*Id.* at 29-32.)

Page 33 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

*Statements by Birkinbine and Simon.* The court agrees with the City that the statements by other sergeants to Reyna are not adverse employment actions. Accepting as true that Birkinbine and Simon each asked Reyna, in any angry or hostile manner, when she was going to retire (First Reyna Dep. at 51:23-56:11), that is insufficient to show conduct that would deter a reasonable employee from engaging in protected activity. *See Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) (holding that "'snide remarks' and threats, such as 'your number's up'" by supervisor were insufficient to deter a reasonable employee from engaging in protected activity).

*Identification as Complainant.* The court also agrees that the identification of Reyna as a complainant in the IPR case was not an adverse employment action. It is undisputed that, as a result of Reyna's March 2019 tort claim notice, an IPR case (2019-B-0022) was opened to investigate her allegations of misconduct by PPB members. The "complainant" for that case was PPB, because PPB had initiated the case (in response to Reyna's tort claim notice). But IPR sent Reyna a "notice of interview" for the case that erroneously identified her as the complainant, rather than a witness, for that case. Reyna's supervisor and IPR staff also received that notice. But it is also undisputed that Reyna's March 2019 tort claim notice was "published in the media" around the same time, and that people at PPB were generally aware of her tort claim notice. (First Reyna Dep. at 46:21-47:23, 53:23-54:02, 55:08-55:13.) In that context, Reyna has failed to show how an interview notice listing her as the complainant was "reasonably likely to deter [Reyna] or others from engaging in protected activity," *Ray*, 217 F.3d at 1242-43.

*May 2019 Interview.* The court agrees with Reyna, however, that the May 2019 interview was an adverse employment action. It is undisputed that Reyna was compelled to participate in

Page 34 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

the two-and-a-half-hour interview about the allegations in her tort claim notice; that she was required to answer questions fully and truthfully, or else risk discipline, including discharge; and that McKechnie used the interview to ask about Reyna's own potential violations of a PPB rule. (Pl.'s Ex. 4 at 1-4.) Construing the facts in the light most favorable to Reyna, McKechnie's questions about Reyna's potential violation of a PPB rule were not standard or necessary to investigate Reyna's allegations against other PPB employees. Accepting that fact and considering all the circumstances, the court concludes that the compelled interview was conduct reasonably likely to deter an employee from filing a tort claim notice. That neither McKechnie nor IPR *themselves* had authority to discipline Reyna (Def.'s Reply at 34) does not alter the court's conclusion.

Even if Reyna can establish a *prima facie* case as to the compelled interview, the City contends that it had a legitimate, nondiscriminatory reason for conducting the interview. It offers new evidence[13] in its Reply, contending that the interview was consistent with PPB's official policies, which require IPR to open and investigate cases following tort claim notices that allege

---

[13]    Although Reyna has neither filed a motion to strike the City's new evidence nor sought leave to respond to that evidence, the court notes that new evidence in a reply to a motion for summary judgment is inappropriate if it "should have been addressed in the opening brief." *Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006). And new evidence in a reply should not be considered "without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *see also Aguilar v. Peters*, Case No. CV-23-00268-TUC-SHR, 2024 WL 4870496, at *13 (D. Ariz. Nov. 22, 2024) ("The Court need not consider evidence submitted for the first time in a reply."). Here, however, the court need not allow Reyna to respond, because the City's new evidence fails to show that the City is entitled to summary judgment as to the May 2019 interview.

serious officer misconduct, and to interview witness and involved officers. (Def.'s Reply at 33 (citing Berry Decl. ¶¶ 5, 9-12; Exs. 1-2, Ex. 3 at 27, ECF Nos. 109 through 109-3).)

But the City identifies no policy addressing the specific scenario where an employee files a tort claim notice. Nor does the City offer any evidence that IPR had ever before compelled the filer of a tort claim notice to participate in an interview about that notice. (*See* Def.'s Mot. at 29-32; Def.'s Reply at 33.) Reyna, on the other hand, has offered evidence suggesting that the compelled interview in this situation was neither ordinary nor consistent with PPB policy. Neither the City attorney nor an IPR investigator, when asked during the interview, could say whether such an interview had ever been conducted before. (Pl.'s Ex. 4 at 2-3.) Nor could McKechnie recall, in her deposition, ever participating in any other IPR interview stemming from a tort claim notice. (McKechnie Dep. at 48:21-49:13.) And, despite that she was ostensibly to be interviewed "as a witness," Reyna was questioned about her own compliance with Administrative Rule 2.02, and some of that Rule was even read aloud. (Pl.'s Ex. 4 at 4-6.) Reyna has presented sufficient evidence to create a genuine dispute of material fact as to whether the compelled interview was motivated by retaliatory animus.

*Retirement/Constructive Discharge*. Reyna asserts in her Response that she retired prematurely because of "investigations and harassment by individual officers." (Pl.'s Resp. at 3.) The City argues that Reyna will be unable to show that she retired *because of* retaliatory conduct by PPB, pointing to Reyna's statements in deposition that she moved to Florida in May 2019 "to get away from Sara Fox," who was harassing her both in the workplace (by filing false complaints) and in their personal life (by emailing her late at night, by "engaging in acts of

parental alienation," and by contacting Reyna even after Reyna had told her not to). (Def.'s Mot. at 30; First Reyna Dep. at 15:18-16:05.)

Reyna explained in her deposition that "Sara Fox forced her to retire," by withholding their child "in violation of a court ordered parenting plan," which required Reyna to call local law enforcement to enforce the parenting plan, in turn requiring Reyna to notify her lieutenant of the incident, who was going to have to "report it up the chain of command." (Second Reyna Dep. at 261:17-24.) That situation forced Reyna to retire because she believed that PPB would retaliate against her if she reported Fox to law enforcement. (*Id.* at 262:01-07.) That is, Reyna's own testimony is that she retired because of Fox's harassment and violations of a court-ordered parenting plan, not any retaliatory conduct by the City. Reyna's belief that PPB *would* retaliate against her is insufficient to support a claim for constructive discharge under Oregon law, which requires a showing that the employer "deliberately created" "unacceptable working conditions" with "the intention of forcing the employee to leave the employment." *McGanty v. Staudenraus,* 321 Or. 532, 553 (1995). Reyna has produced no evidence showing that she was forced to retire by the City's retaliatory conduct. (*See* Pl.'s Resp.)

*Disciplinary Suspension for Bullying.* Reyna contends that she was disciplined, in September 2018, in retaliation for her report in April 2017 that Fox had committed perjury in court documents. (Pl.'s Resp. at 2.) Liberally construing Reyna's arguments in support of this theory, the court understands her to rely on two facts to establish causation: (1) Jeffrey Bell, the head of internal investigations, testified in deposition that Reyna's was the only bullying charge he had ever investigated (*see* Pl.'s Resp. at 2-3 & n.5), and (2) that the discipline for that charge

was imposed shortly after Reyna applied for a promotion. Neither of those facts creates an inference of causation.

As to the fact that investigations into bullying allegations are rare at PPB, the court accepts that fact as undisputed. But the contention that the investigation into Reyna's bullying was motivated by retaliatory animus for her April 20, 2017 report is unsupported by the record, which shows that the complaint against Reyna for bullying was made in December 2016; that PPB members were interviewed about the allegations of that complaint, including the bullying allegation, in February and March 2017; and that the investigator's report as to the bullying allegation was issued on April 6, 2017. The investigation into the bullying allegation occurred *before* Reyna's report against Fox, and thus could not have been retaliation for that report.

As to the timing of the discipline, Reyna points out that she received a disciplinary suspension on September 26, 2018, after the bullying investigation had "la[in] dormant for nearly a year," and only 13 days after she had applied for a promotion. (Pl.'s Resp. at 25, 27; *see also id.* at 2-3.) She contends that the timing of the discipline—shortly after her application for a promotion—creates an inference that the discipline was issued only to prevent her from receiving a promotion. (*Id.* at 2-3, 25-27.)

The court first notes that it is skeptical of Reyna's theory that the imposition of discipline shortly after she applied for a promotion supports an inference that the discipline was imposed in retaliation for a report she made more than a year earlier. Timing generally only supports causation "where an adverse employment action follows on the heels *of protected activity*." *Villiarimo,* 281 F.3d at 1065 (emphasis added).

Page 38 – OPINION AND ORDER
*Reyna v. City of Portland*, 3:21-cv-01839-AR

In any case, the record disproves the contention that the bullying investigation was "dormant" until after Reyna applied for the promotion. Reyna participated in a meeting with Chief Day and other PPB officials regarding the bullying charge on September 6, 2018—only 20 days before her discipline was imposed. (Def.'s Sealed Ex. 9, ECF No. 94-1 at 83-85 (Reyna's rebuttal to bullying allegation); *see also* First Reyna Dep. at 126:05-127:03.) Accordingly, even if the investigation did lay dormant for a time before September 2018, timing does not support Reyna's theory that the discipline was only imposed to prevent her from receiving the promotion, in retaliation for her April 2017 report against Fox.

*Failure to promote*. As discussed in the court's analysis of Claim 4, the undisputed evidence shows that (1) Reyna received a score of 71.57 on the lieutenant's assessment and (2) the passing score was set at 75. Reyna has provided no evidence showing that she would have received a higher score absent her protected activities. Nor has she offered any argument or evidence to overcome the evidence indicating that the pass point was set at 75 because it was consistent with prior recruitments. Instead, Reyna points to McKechnie's statements in the May 2019 interview to show that McKechnie held a retaliatory animus toward Reyna. But statements in that interview, which resulted from and related to Reyna's March 2019 tort claim notice, are insufficient to create a question of fact that McKechnie harbored a retaliatory animus toward Reyna as of fall 2018, because of earlier qualifying protected activities.

## CONCLUSION

For the above reasons, the City's Combined Motion (ECF No. 92) is GRANTED IN PART and DENIED IN PART, as explained above. Claims 4 and 5 are dismissed with prejudice.

Reyna's whistleblower retaliation claims—Claims 1 and 2—survive as to the compelled

interview in May 2019, and are otherwise dismissed with prejudice.

DATED:  March 7, 2025

_____

JEFF ARMISTEAD
United States Magistrate Judge